IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JEREMY COPUS and RIKKI STANKEVITZ, | § § § | |
| *Plaintiffs*, | § § § | CIVIL ACTION NO. <u>1:26-cv-00270</u> |
| *vs.* | § § | |
| HARBOR FREIGHT TOOLS USA, INC., | § § § | |
| *Defendant*. | § § | |

## COMPLAINT

Plaintiffs Jeremy Copus and Rikki Stankevitz (collectively "Plaintiffs") file this Original Complaint against Harbor Freight Tools USA, Inc. In support thereof, Plaintiffs respectfully show the Court as follows:

## I.
## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Jeremy Copus is an individual residing in Austin, Travis County, Texas.

2. Plaintiff Rikki Stankevitz is an individual residing in Austin, Travis County, Texas.

3. Defendant Harbor Freight Tools USA, Inc. ("***Harbor Freight***") is a foreign corporation organized and existing under the laws of the State of Delaware with its headquarters and principal place of business in the State of California. Defendant Harbor Freight maintains a registered agent for service of process in the State of Texas. Service of process may be made on Harbor Freight by serving its

registered agent for service of process in the State of Texas: Corporate Creations Network, Inc.; 2595 North Dallas Parkway, Suite 350; Frisco, Texas 75034.

4.     Jurisdiction is proper in this Court because there is diversity of citizenship between the parties as provided by 28 U.S.C. § 1332(a)(1) and the amount in controversy, exclusive of interest and costs, is in excess of $75,000.

5.     At all times relevant to these causes of action, Harbor Freight had continuing and systematic contacts with the State of Texas by delivering its products—such as that involved in this litigation—into the stream of commerce with the expectation that they would be sold in the Texas market, including through the use of Harbor Freight retail stores located throughout the State of Texas.

6.     Venue is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## II.
## FACTS

7.     Plaintiff Jeremy Copus is a Captain in the City of Austin Fire Department.

8.     In May of 2019, Copus went into a Harbor Freight retail store and purchased Harbor Freight's Pittsburgh Pro 3/8-inch ratcheting breaker bar with an 18-inch handle (the "***Breaker Bar***") for use in working on vehicles at his home.

9.     On October 23, 2023, Copus was in his garage at his prior home in Travis County using the Breaker Bar to loosen lug nuts on the wheel of a small

trailer. This was an intended and foreseeable use of the Breaker Bar. Initially, he loosened a few of the lug nuts successfully. However, while applying torque to loosen another lug nut, the metal "head" on the end of the ratcheting mechanism suddenly, and without warning, fractured in a catastrophic failure, sending a large, sharp, and jagged piece of metal flying into Copus's left eye.

10.     As a result, Copus suffered severe, permanent, and disabling injuries to his left eye among other injuries and damages.

11.     A breaker bar is a special type of socket driving tool that is used when large amounts of force and torque are needed to tighten or loosen a fastener, with the lug nut or lug bolt on the wheels of a car, truck, or trailer being the single most common use for such a tool. Breaker bars are equipped with a handle that is significantly longer than other wrenches to provide the user with the necessary leverage to break loose bolts that require a large amount of torque to tighten or, more frequently, remove. The makers and sellers of breaker bars, including Harbor Freight, know that this type of tool must be very robust and strong to endure its expected and intended uses.

12.     The Breaker Bar purchased by Copus was designed, manufactured, tested, sold, distributed, and marketed by Defendant Harbor Freight.

13.     Presented below are a picture and description from Harbor Freight's website of a ratcheting breaker bar that is the same as the one Copus was using when he was injured on October 23, 2023.



**PITTSBURGH PRO**

3/8 in. Drive 18 in. Ratcheting
Breaker Bar

★ ★ ★ ★ ★ (531) ∨   Write a Review

This breaker bar features a ratchet head that swivels
180 degrees

$19⁹⁹



## PRODUCT OVERVIEW ————————————————

This breaker bar has reversible ratcheting action plus the option to lock the ratchet mechanism for use as a traditional breaker bar. The 3/8 in. drive ratchet head swivels 180 degrees. Made of for extreme durability.

- Left/right reversible ratcheting action
- Head locks in place for use as a standard breaker bar
- Heavy duty chrome plated chrome vanadium steel

14.    Copus relied on Harbor Freight's representation that the product was a "breaker bar," such that it had the strength and durability required to safely function as a breaker bar is intended to be used and most commonly is used – to break loose lug nuts – and was otherwise strong enough to be safely used for other breaker bar uses, when purchasing it.

-4-

15.     The Breaker Bar sold by Harbor Freight is at least somewhat unique from other fixed breaker bars in that it incorporated a cylindrical ratcheting mechanism at the end of it – shown by red arrows in picture above. Many breaker bars do not have a ratcheting function and have a swiveling socket attachment that is otherwise fixed, and very robust. On information and belief, the reason many breaker bars do not ratchet is due to the strength that is required for a breaker bar application, and the design required for a ratcheting mechanism is difficult to achieve consistently with the need to handle the stress and strain that is experienced by breaker bars given their very purpose. Instead, a user would typically use a breaker bar to initially "break loose" a very tight fastener first and then switch to a ratchet to finish removing the fastener after it had been loosened.

16.     Harbor Freight has received notice for over a decade that its ratcheting breaker bars like the one purchased by Copus were defective and unreasonably dangerous. One way in which Harbor Freight received such notice was from the many customers who posted reviews on Harbor Freight's own website to report that their breaker bars broke in the same way that Plaintiff's did on October 23, 2023. In fact, some consumers even posted photographs of the failure to their breaker bars directly onto Harbor Freight's website, and their pictures reveal a fracture almost identical to the one that caused Copus's injuries. Examples of such postings on Harbor Freight's website are below.

-6-

# TERRIBLE!!!

Broke the first time I used it. The ratcheting system snapped in two. Cheap metal housing.

Eric
May 24, 2018







Works good short term but will break

Shannon, Feb 8, 2022

3/8 in. Drive 18 in. Ratcheting Breaker Bar

**WRITE REVIEW**





Do not buy

Chris, Sep 14, 2022

3/8 in. Drive 18 in. Ratcheting Breaker Bar

**WRITE REVIEW**



17.     The customer reviews posted to Harbor Freight's publicly-accessible website and published on that website reflect that, just between September 2011 and May 2019 (which is when Copus bought his Breaker Bar), Harbor Freight had received at least 36 individual customer reviews that described a total of at least 45 individual breaker bar failures – as some customers reported that they had suffered a second, third, or fourth failure of the same product after prior failed products had been returned and then replaced under Harbor Freight's warranty program. Following the time that Copus purchased his breaker bar, additional customer

reviews kept coming in, with at least 68 additional reviews to Harbor Freight's website describing at least 78 individual failures between May 2019 when Copus bought his breaker bar and October 23, 2023 when he suffered his injuries. Of course, these are just the reviews that Harbor Freight chose to leave published on its public website.

18.    On information and belief, not all negative reviews are ultimately published to Harbor Freight's public website. Copus, himself, reached out to Harbor Freight and left his own review to report his experience with the Breaker Bar and the catastrophic failure that seriously injured him; however, Copus's complaint was not published to Harbor Freight's website and Copus's warnings therefore never reached the consuming public who might have wanted to learn about Copus's bad experience with the 18-inch long Pittsburgh Pro ratcheting breaker bar.

19.    On information and belief, Harbor Freight would or could have received additional notice about the defects in its Breaker Bar through other sources, such as through other communications with consumers or by receiving custody of broken Breaker Bars from customers who had returned them for a refund or replacement. Harbor Freight could have evaluated these returned products to assess the reasons for their failures and learned that such failures were not only common but related to the design defect of utilizing a ratcheting head that was designed with too thin and too weak of a metal for the product's intended, advertised, marketed, and foreseeable uses.

20.    Tragically, Copus did not know what Harbor Freight knew about its defective Breaker Bar at the time he bought it. Like most of Harbor Freight's

customers, Copus purchased his Breaker Bar in-person at one of Harbor Freight's retail stores and did not have the benefit of having seen the reviews and photos that previous purchasers had left online.

21. For years prior to the injuries suffered by Copus, Harbor Freight had the opportunity to conduct testing of its ratcheting breaker bar design, both on customer-returned bars and its own exemplars, from which Harbor Freight could and should have learned that its ratcheting breaker bar design was of a woefully inadequate strength to perform the tasks for which it was designed.

22. Harbor Freight gained additional notice from a lawsuit that was filed against Harbor Freight on February 17, 2023, in the United States District Court for the District of Kansas, in which a plaintiff named Ronald Nicholas Geraci pleaded that one of Harbor Freight's 3/8-inch drive ratcheting breaker bars had shattered during his use of the product, severely damaging his left eye, leaving him permanently blind in that eye, and suffering from a multitude of other problems after having undergone multiple surgeries to manage the injury and its sequalae. *See Geraci v. Harbor Freight Tools USA, Inc.*, Case No. 23-cv-2066 (D. Kan.). In his Complaint, Mr. Geraci included photographs of his breaker bar after the failure that he alleged had blinded him, and those photos are shown below.



23.     The defects in Harbor Freight's Pittsburgh Pro 18-inch long 3/8-inch drive ratcheting breaker bar almost always result in the outer rotating black phosphate coated "head" to which the socket also attaches breaking essentially in half, where the ratcheting pawls press against it.

24.     The following pictures are from Copus's Breaker Bar, and they reveal that it broke in this same manner, looking strikingly similar to the examples posted on Harbor Freight's website by Harbor Freight's own customers and the breaker bar that was pictured in Geraci's prior lawsuit.



25.    On information and belief, even Harbor Freight has finally acknowledged the defective design of its Pittsburgh Pro 18-inch long ratcheting breaker bars, as it eventually agreed to change the design of the product in an effort to make it stronger. In either late 2024 or early 2025, Harbor Freight began selling an altered version of the 18-inch long 3/8-inch drive ratcheting breaker bar, which can be found in its retail stores and on its website with a ratcheting head made of

thicker metal. However, since the release of this improved, stronger version of the 18-inch long 3/8-inch drive ratcheting breaker bars, some consumers have still posted reviews to Harbor Freight's website with reports of even the newer product failing in a similar fashion to the scores of reports for the older version like the ones sold to Copus and Geraci.

26. In any event, Harbor Freight knowingly and intentionally continued to sell its Pittsburgh Pro 18-inch long ratcheting breaker bars, including the subject breaker bar that injured Plaintiff Copus, well after it knew what it had learned from a decade of notice that included reports directly from its own consumers to Harbor Freight in various forms including reviews to Harbor Freight's website and otherwise, that the Breaker Bars were failing at a high rate, were not strong enough for the purposes for which they were advertised, marketed, sold, and foreseeably used, and that those defects posed an unreasonably severe risk of serious injury to people using the product. Harbor Freight's conduct posed such a severe risk of foreseeable harm to consumers, including Plaintiffs, as to constitute malice and despicable conduct carried on by Harbor Freight with a willful or conscious disregard for the rights and/or safety of others.

## III.
## CAUSES OF ACTION

**Count I:  Strict Liability for Design and Manufacturing Defects**

27. Plaintiffs re-allege and incorporate herein by reference each and every allegation in all preceding paragraphs, as if fully set forth herein.

28.     Harbor Freight was and is regularly engaged in the business of supplying or placing products like the Breaker Bar into the stream of commerce for use by the consuming public, including Copus. Such conduct was and is solely for commercial purposes.

29.     At all times mentioned, Harbor Freight manufactured, designed, distributed, marketed, advertised, sold, supplied, tested and/or inspected the Breaker Bar and its relevant component parts, acting by and through its officers, directors, employees, and/or managing agents. Harbor Freight was both the "Manufacturer" and "Seller" of the Breaker Bar, as defined by Texas Civil Practice & Remedies Code § 82.001.

30.     Defendant Harbor Freight is also deemed to be the manufacturer of the Breaker Bar by operation of U.S. law as a result of importing it from overseas under the regulations found within 16 C.F.R. § 1009.3.

31.     Additionally, Harbor Freight marketed and sold the Breaker Bar under its own "Pittsburgh Pro" product line trade name, bearing its name and labeling, with in-package instructions and manuals bearing Harbor Freight's own trade name and symbols.

32.     Harbor Freight manufactured, distributed, and sold the Breaker Bar knowing that:

a)     it would reach customers, including Copus, without substantial change in the condition in which it was sold;

b)     it would be used by consumers without inspection for defects; and,

c)   that Harbor Freight had represented that it could be safely used and was fit for the ordinary purposes for which it was purchased.

33.   The Breaker Bar was defective and unreasonably dangerous in that it was not adequately designed, manufactured, or marketed to minimize the risk of injury or death. By way of example and without limitation, the Breaker Bar was unreasonably, dangerously defective in the following ways:

a)   the Breaker Bar possessed inadequate strength for its intended uses and was highly likely to fail during normal and foreseeable uses, thereby posing a risk of severe injury to the user or others near them during intended and foreseeable uses of the Breaker Bar;

b)   the Breaker Bar failed to adequately protect users from the risk of the Breaker Bar breaking during foreseeable uses; and,

c)   the ratcheting mechanism incorporated into the Breaker Bar possessed inadequate strength for its intended uses and was highly likely to fail during normal and foreseeable uses, thereby posing a risk of severe injury to the user or others near them during intended and foreseeable uses of the Breaker Bar.

34.   At the time the Breaker Bar left the control of Harbor Freight, there were safer alternative designs that, in reasonable probability, would have prevented or significantly reduced the risk of the Plaintiffs' injuries without substantially impairing the Breaker Bar's utility. These safer alternative designs were

economically and technologically feasible by the application of existing or reasonably achievable scientific knowledge.

35.     There was no substantial or material change in the condition of the Breaker Bar from the time that it was originally manufactured, distributed, and sold by Harbor Freight until the time of Copus's injury on October 23, 2023. Stated another way, the Breaker Bar was defective and in an unreasonably dangerous condition when it left the hands of Harbor Freight and remained defective and unreasonably dangerous at all times thereafter until the Breaker Bar ultimately caused Copus's severe injuries.

36.     Copus neither knew nor had reason to know at the time of his use of the Breaker Bar of the defects in the Breaker Bar or the increased risk of harm arising out of those defects.

37.     Harbor Freight anticipated and intended that the Breaker Bar would be used in the manner it was being used by Copus on October 23, 2023. Indeed, at the time the Breaker Bar was placed into the stream of commerce, it was or should have been reasonably expected and foreseeable that persons such as Copus would use the Breaker Bar in the manner and application in which Copus used it at the time that he sustained his severe injuries.

38.     The Breaker Bar's defects were producing and proximate causes of the injuries for which the Plaintiffs are seeking recovery.

**Count II:  Strict Liability for Marketing Defects / Failure to Warn**

39.     Plaintiffs re-allege and incorporate herein by reference each and every allegation in all preceding paragraphs, as if fully set forth herein.

40.     At all times mentioned, Harbor Freight manufactured, designed, distributed, marketed, advertised, sold, supplied, tested and/or inspected the Breaker Bar and its relevant component parts.

41.     At the time it left Harbor Freight's control and through the time it was caused Copus's injuries, the Breaker Bar was unreasonably dangerous and defective due to the lack of adequate warnings, instructions, or labeling to warn users of the existence or the extent of the risks that the Breaker Bar could or would catastrophically fail even in foreseeable uses. The risk of the Breaker Bar breaking in these conditions was not obvious.

42.     Any warnings and instructions that were provided, if any, were not in any form that could reasonably be expected to catch the attention of and adequately alert a reasonably prudent person in the circumstances of the Breaker Bar's intended or reasonably foreseeable uses.

43.     Instead of warning consumers, Harbor Freight misled them, including Copus, by dramatically overstating the safety of the Breaker Bar.

44.     As a direct and proximate result of the failures to warn or instruct of the defects in the Breaker Bar, Plaintiff Copus suffered injury when the Breaker Bar suddenly and unexpectedly fractured during foreseeable use, thereby causing serious injuries.

**Count III:  Negligence**

45.     Plaintiffs re-allege and incorporate herein by reference each and every allegation in all preceding paragraphs, as if fully set forth herein.

46.    At all times herein mentioned, Harbor Freight had a duty to use that degree of care and skill of a reasonably careful expert in the design, manufacture, testing, inspection, labeling, distribution, marketing, examination, maintenance, preparation for use, sale, and warning of a breaker bar product for foreseeable uses.

47.    Harbor Freight knew or should have known that the Breaker Bar was of such a nature that if it was not properly designed, manufactured, tested, inspected, distributed, marketed, examined, prepared and sold, it was likely to cause serious injury or death to their users.

48.    Nevertheless, Harbor Freight so negligently and carelessly designed, manufactured, tested, failed to test, failed to inspect, displayed, sold, examined, failed to examine, and failed to warn of the dangerous propensities of the Breaker Bar that the product catastrophically failed when used by Copus.

49.    In particular, Harbor Freight breached its duty of care by:

    a)    failing to adequately design the Breaker Bar to be strong and robust enough to endure the forces that Harbor Freight should have reasonably anticipated and expected that it should have been expected to experience during normal, intended, and foreseeable uses;

    b)    failing to adequately test the design of the Breaker Bar to determine whether it would have sufficient strength to be regularly used as a breaker bar;

    c)    failing to incorporate into the product a handle length that was properly matched to the rest of the design such that reasonably

foreseeable users could not, while using the product as intended, impart greater force and torque into the ratcheting breaker bar than the rest of its design, particularly to ensure that the ratcheting head could reasonably endure without suffering a sudden, unexpected, and catastrophic failure;

d)  failing to manufacture the subject ratcheting breaker bar in a non-defective manner; and,

e)  failing to include adequate and appropriate warnings to advise consumers, users, and bystanders of the limited strength and capabilities of the Breaker Bar and the unreasonable risk of serious and permanent injuries it posed to consumers, user, and bystanders when put to its reasonably anticipated and foreseeable uses.

50.  As a direct and proximate result of Harbor Freight's negligence, Plaintiffs have suffered damages for which they seek recovery.

**Count IV:  Breach of Express Warranties**

51.  Plaintiffs re-allege and incorporate herein by reference each and every allegation in all preceding paragraphs, as if fully set forth herein.

52.  At all times herein mentioned, and prior to the time the Breaker Bar was used by Copus, Harbor Freight expressed warranties to the purchasers of its products, by and through statements made by Harbor Freight in labels, publications, packaging, and other written materials intended for consumers and the general public, that the Breaker Bar and its related components were strong

and robust enough for their intended and foreseeable uses as breaker bars, representing the quality to consumers and the public in such a way to induce their purchase or use, thereby making an express warranty that the Pittsburgh Pro 3/8-inch drive ratcheting breaker bars would conform to the representations that Harbor Freight made about their strength, quality, and capability of being used as breaker bars. These express warranties include, but are not limited to, Harbor Freight's "lifetime warranty" on hand tools which lulls consumers into a belief that the relevant products are highly robust, durable, and more than strong enough to perform their intended uses.

53.    Harbor Freight also made representations about the strength and durability of the Breaker Bar by advertising that it was "[m]ade for extreme durability" and constructed out of "[h]eavy duty chrome plated chrome vanadium steel," and generally that conveying that the Breaker Bar was robust and strong enough to be safely used as a breaker bar.

54.    These representations contain or constitute affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

55.    These representations were intended for and were reasonably relied on consumers such as Copus. Harbor Freight had actual or constructive knowledge of the particular purpose for which the Breaker Bar would be utilized by consumers, including Copus. When Harbor Freight manufactured, designed, promoted, distributed and sold the Breaker Bar, it knew or had reason to know that Copus,

who was unskilled in research, design, and manufacture of products, was relying, and did in fact reasonably rely on, Harbor Freight's express warranties.

56.     Harbor Freight breached these warranties because, contrary to Harbor Freight's representations, the Breaker Bars were inadequately strong, inadequately durable, incapable of reliable and consistently performing as breaker bars, but were instead prone to catastrophic failure for the reasons described above and lacked appropriate warnings and labels.

57.     Copus detrimentally relied on Harbor Freight's express warranties by purchasing the Breaker Bar and using it as a breaker bar. Copus had no knowledge of the falsity or incompleteness of Harbor Freight's statements and representations concerning the Breaker Bar.

58.     Indeed, Harbor Freight had sole access to material facts concerning the nature of the risks associated with the Breaker Bar and knew that users such as Copus could not have reasonably discovered the risks and hazards associated with the use of Breaker Bar.

59.     If the Breaker Bar had performed as warrantied, the Breaker Bar would not have catastrophically failed and Plaintiffs would have avoided their injuries. Thus, as a direct and proximate result of Harbor Freight's breach of its express warranties, Plaintiff has suffered injuries for which they seek recovery.

**Count V:  Breach of Implied Warranties**

60.     Plaintiffs re-allege and incorporate herein by reference each and every allegation in all preceding paragraphs, as if fully set forth herein.

61.     At all times herein mentioned, and prior to the time the Breaker Bar was used by Copus, Harbor Freight was a merchant with respect to the sale of the Breaker Bar. As such, Harbor Freight impliedly warranted to its consumers and the general public that the Breaker Bar was of merchantable quality, safe and fit for its intended and foreseeable uses, and free from any design or manufacturing defects that posed a risk of serious injury to users and bystanders.

62.     However, the Breaker Bar was (a) not of merchantable quality, (b) not fit for use by or around users, consumers, and/or bystanders and for the purpose for which they were to be used, and (c) not free from design and manufacturing defects which posed a risk of serious injury to users and bystanders.

63.     As a reasonably foreseeable result of Harbor Freight's breach of its implied warranties, Plaintiffs have suffered damages for which they seek recovery.

## IV.
## PLAINTIFFS' DAMAGES

64.     The catastrophic failure of the Breaker Bar caused Copus to suffer serious and permanent injuries, including but not limited to the traumatic *commotio retinae* suffered in his left eye, loss of vision in the past and in the future, and the risk of developing both glaucoma and cataracts as a result of the trauma suffered when the Breaker Bar suddenly and unexpectedly broke and threw metal shrapnel into his left eye. Copus is informed and believes that these injuries and harms will result in permanent losses of his visual acuity, ability to see in light and dark conditions, and other serious harms to his person and his left eye.

65. Additionally, Copus has suffered injuries to his health, strength, and activity, including injuries to his body and shock and injuries to his nervous system, affecting both his physical and mental well-being.

66. Copus was compelled to and did employ the services of hospitals and physicians, including ophthalmology and corneal-retinal specialists, surgeons, nurses, and the like to care for and treat him. He has already incurred hospital, medical, professional and incidental expenses, and he will necessarily incur additional like expenses in the future.

67. Additionally, due to his injuries, Plaintiff was prevented from attending to his usual occupation, and believes and is informed that he may be prevented from attending his usual occupation for some time in the future and in a lower earning capacity than what he would have enjoyed but for these injuries.

68. Thus, Plaintiffs allege that Harbor Freight's improper and unlawful conduct is and was a producing and proximate cause of severe and permanent injuries sustained by Copus. He seeks personal injury damages in amounts the jury deems to be fair and reasonable for the following:

- his past and future physical pain;

- his past and future mental anguish

- his past and future loss of earnings and earning capacity;

- his past and future disfigurement;

- his past and future loss of consortium;

- his past and future physical impairment;

- his past and future medical and healthcare expenses and mental

care expenses; and,

- any other actual or compensatory damages allowable by law.

69.    Plaintiff Rikkie Stankevitz has incurred injuries as the wife of Plaintiff Jeremy Copus as a result of the injuries and damages to Copus. Stankevitz has been deprived of the love, companionship, comfort, affection, society, solace or moral support, protection, loss of enjoyment of marital and sexual relations, and loss of physical assistance in the operation and maintenance of the home by her spouse, and has thereby sustained, and will continue to sustain damages which she seeks to recover in this suit.

## V.
## EXEMPLARY DAMAGES

70.    Plaintiffs are entitled to exemplary damages because Harbor Freight's acts and/or omissions, when viewed objectively from the standpoint of Harbor Freight at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Harbor Freight had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of others. Harbor Freight's acts and omissions, collectively and severally, constitute fraud, malice and gross neglect, which fraud, malice and gross neglect was a proximate cause of the damages suffered by Plaintiffs. Harbor Freight's conduct was done with oppression, fraud, malice, and in conscious disregard for the rights and safety of those who would foreseeably be exposed to risk of serious injury by use of the Breaker Bar. Harbor Freight was fully aware of an unreasonable risk of

serious injuries posed by the Breaker Bar's design. Nonetheless, it deliberately continued to sell it, long after it knew or should have known of the unreasonable risks of serious injury. Not only that, but Harbor Freight deliberately crafted its labeling, marketing, promotion, and representations to mislead consumers about those unreasonable risks.

71. This was not an accident. Harbor Freight simply calculated that its marketing efforts would continue to generate profits until such time as the negative experiences with the Breaker Bar finally became so widespread that Harbor Freight's own profit interests required pulling the Pittsburgh Pro 3/8-inch drive 18-inch ratcheting breaker bar off the market. But until that time, Harbor Freight was content to let the injuries pile up. A punitive award should be made to compel Harbor Freight to sufficiently internalize the costs that its defective products impose.

## VI.
## PRE- AND POST-JUDGMENT INTEREST

72. Plaintiffs seek to recover pre-judgment and post-judgment interest at the maximum amount allowed by law.

## VII.
## PRAYER

WHEREFORE, Plaintiffs request that Harbor Freight be compelled to appear and answer this Complaint and that, following trial of this case, the Court enter judgment against Harbor Freight and award Plaintiffs the following relief:

-25-

(i)     a sum of money, as determined by a jury to be fair and reasonable, for the damages indicated above;

(ii)    pre-judgment and post-judgment interest at the maximum amount allowed by law;

(iii)   exemplary damages in an amount sufficient to penalize or punish Harbor Freight;

(iv)    costs of suit; and

(v)     such other and further relief to which Plaintiffs may be justly entitled.


Filed on: February 4, 2026.

Respectfully submitted:

/s/*Chip Brooker*
Eugene A. "Chip" Brooker, Jr.
Texas Bar No. 24045558
*chip@brookerlaw.com*
Eric T. Stahl (*pro hac vice* to be sought)
Texas Bar No. 00794685
*office@etstahl.com*
Brooker Law, PLLC
4311 Oak Lawn Ave., Suite 620
Dallas, Texas 75219
214.217.0277 [Telephone]
469.405.1049 [Facsimile]

Benjamin C. Fields (*pro hac vice* to be sought)
CA Bar No. 331033
*ben@fieldslaw.com*
Fields Law Firm
354 Pine Street, Third Floor
San Francisco, CA 94104
415.376.2877 [Telephone]
816.659.9969 [Facsimile]

**ATTORNEYS FOR PLAINTIFFS**